IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| John Allen Farr, | C/A No.: 3:16-2668-RMG-SVH |
| Plaintiff, | |
| vs. | |
| | REPORT AND RECOMMENDATION |
| South Carolina Electric and Gas Company, | |
| Defendant. | |

In this employment discrimination case, John Allen Farr ("Plaintiff") is suing his former employer, South Carolina Electric and Gas ("Defendant" or "SCE&G"). Plaintiff alleges the following causes of action pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12102, *et seq.* ("ADA"): (1) disparate treatment; (2) hostile work environment; (3) failure to accommodate; and (4) retaliation. [ECF No. 1-1]. This matter comes before the court on Defendant's motion for summary judgment. [ECF No. 31]. This matter having been fully briefed [ECF Nos. 33, 36], it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district judge grant in part and deny in part Defendant's motion for summary judgment.

I.   Factual Background

Plaintiff was formerly employed by Defendant for 34 years, most recently in the capacity of Material Handler. [ECF No. 31-4 at 16]. Plaintiff was required to have a valid Commercial Driver's License ("CDL"), and, therefore, had to comply with the Department of Transportation ("DOT") guidelines and regulations. Pl. Dep. 78:13–24.[1] As of July 2013, Plaintiff's job duties included using a company pickup truck. [ECF No. 31-4 at 16]. Plaintiff's supervisor at the time, Harold "Bucky" Hudson ("Hudson") rated Plaintiff as meeting Defendant's expectations from at least 2008 through July 29, 2013. [ECF No. 33-11 at 1–3, 7–17].

In 2003, Mr. Farr began to suffer from chronic back pain, although he had had back trouble for over 20 years. [ECF No. 31-4 at 17]. He received medical treatment at that time, taking Fentanyl, Oxycontin, and other narcotic pain medications to attempt to ease the pain. *Id*. His back problems were known to Hudson, his then-supervisor. Hudson Dep. 22:20–24.[2] In 2012, Plaintiff had spinal stimulator surgery. Pl. Dep. 20:18–21:3. Plaintiff experienced little-to-no back pain after undergoing the spinal stimulator procedure. *Id*.

In 2013, Plaintiff realized that he was addicted to the narcotics prescribed for his back pain during the preceding ten years. [ECF No. 31-4 at 17]. While on medical leave to seek treatment for his addiction in the summer 2013, Plaintiff contacted Teresa Thompson ("Thompson"), the on-site insurance representative for SCE&G, and sought

---

[1] Plaintiff's deposition may be found at ECF No. 31-2.
[2] Hudson's deposition may be found at ECF No. 33-8.

advice regarding whether Suboxone, a drug used to treat opioid dependence, was covered. ECF No. 33-2 at 2. Plaintiff feared retaliation by his employer and was hesitant to provide identifying information to Thompson, but he was assured that she would not tell anyone at SCE&G about their discussion. [ECF No. 33-2 at 13–14]. On July 22, 2013, Plaintiff sought and received medical assistance for his prescription drug addiction. [ECF No. 31-4 at 17]. He was prescribed Suboxone and returned to work on July 25, 2013. *Id.*

After speaking with Plaintiff, Thompson contacted Tandra Frost ("Frost"), Supervisor of Benefits at SCE&G, to inform her about Plaintiff's call, and Frost then pulled the recording of the call. Thompson Dep. 19:21–25, 20:6–21:9,23:20–24:7.[3] Sarah Delk ("Delk"), who assisted with benefits, notified Human Resources Manager Sue Sheppard ("Sheppard") of Plaintiff's phone call with Thompson because Plaintiff had a CDL, and she was concerned Plaintiff's medical situation could affect SCE&G's compliance with DOT regulations. Sheppard Dep. 15:13–16:5; 17:20–18:12.[4] Sheppard, however, also admitted that, at the time, Plaintiff drove a small company pickup truck for which a CDL was not required. [Sheppard Dep. 15:7–22.]

Upon Plaintiff's return to work on July 25, 2013, he was immediately advised by Sheppard and Delk that he was required to pass a fitness-for-duty examination by Dr. Floyd, Defendant's physician of choice. [ECF No. 31-4 at 17]. In the meantime, Plaintiff was placed on leave. *Id.* Keller Kissam, President of Retail Electric, and Hudson had

---

[3] Thompson's deposition may be found at ECF No. 33-33.
[4] Sheppard's deposition may be found at ECF No. 33-28.

3

been made aware that Plaintiff was being or had been sent for a fitness-for-duty examination. Sheppard Dep. 39:21–25; 41:2–42:3; Hudson Dep. 26:2–27:13. That day, Hudson drove Plaintiff home because Plaintiff no longer had use of the company truck. Hudson Dep. 27:14–28:2, 36:18–21, and 95:12–18.

Dr. Floyd reviewed Plaintiff's medications and recommended that Plaintiff's prescribing physicians and a substance abuse professional provide letters of clearance before allowing Plaintiff to work around dangerous equipment or machinery, work at heights, or operate any company vehicle. [ECF No. 31-4 at 12–13]. After receiving the letters of clearance, Dr. Floyd found that Plaintiff could safely perform his job duties and released him to work. *Id*.

On August 23, 2013, his first day back at work, Plaintiff had a meeting with Delk and Sheppard to discuss Dr. Floyd's assessment and recommendations. *Id*. Based upon Dr. Floyd's findings, Defendant required Plaintiff to: (1) refrain from using any controlled substances unless prescribed and then only as specifically instructed; (2) cooperate with his substance abuse professionals, including attendance at all scheduled meetings; and (3) attend follow-up visits with Dr. Floyd at three-month, six-month, and one-year intervals. *Id*. Plaintiff alleges, and Defendant has not disputed, that he was forced to sign releases pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") so that his doctors could provide Defendant with updates on his progress. [ECF No. 31-4 at 17].

Ten or fifteen minutes after his meeting with Delk and Sheppard, Plaintiff met with Sheppard, Kissam, Hudson, and Scott Fulmer, a union representative. Sheppard

Dep. 43:16–44:4. In this meeting, Kissam advised Plaintiff that the instant meeting had nothing to do with the prior meeting, although Sheppard had assured Plaintiff that the individuals attending the second meeting had no knowledge of the first. Pl. Dep. 164:23–165:19. Plaintiff was given a Corrective Action form and advised that he was being disciplined for having a severely dirty and cluttered work truck, in violation of Life Rule X – Housekeeping for Motor Vehicles ("Corrective Action"). Pl. Dep. 157:8–24; ECF No. 31-3 at 27. Plaintiff signed the Corrective Action, but testified in his deposition that he had not been trained on the Life Rules at that time. Pl. Dep. 161:4–11; 164:1–8. Plaintiff also testified that while his truck was probably in one of the worst conditions, his manager had conducted quarterly inspections and had never disciplined Plaintiff for its condition. Pl. Dep. 169:12–25. Plaintiff was also informed that he no longer had access to a company vehicle, that he would be transferred to the storeroom, and that any further violation of company policies or procedures would result in immediate termination. [ECF No. 31-3 at 27]. Plaintiff was transferred to another location (i.e., the storeroom) because of the Corrective Action; however, his job title, responsibilities, pay, benefits, and other terms and conditions of employment remained the same. Pl. Dep. 81:9–20. Plaintiff's supervisor changed from Hudson to Willie Evans ("Evans"), with Hudson supervising Evans.

Plaintiff received a second corrective action[5] on October 30, 2013, after Defendant claimed Plaintiff had been "story telling" about his discipline to coworkers ("Second

---

[5] Both corrective actions indicate within the body of the documents that that they are "Final Written Corrective Actions."

5

Corrective Action"). [ECF No. 31-8 at 46]. According to Kissam, management had heard that Plaintiff had discussed the Corrective Action, including allegations that Kissam had raised his voice and curse at Plaintiff. Kissam Dep. 35:13–36:17.[6] There was no confidentiality provision in the Corrective Action and, although the Second Corrective Action states that Plaintiff violated a specific rule of policy, no rule or policy is cited. [ECF No. 31-8 at 46]. The Second Corrective Action directs Plaintiff to "[n]ot run his mouth and continue to stir things up." *Id.*

On December 18, 2013, Plaintiff met with Hudson for his year-end evaluation. Even though approximately half of his working year had been under Evans's supervision without incident, Plaintiff received a "does not meet expectations" for the year. [ECF No. 33-11 at 4]. All of the comments supporting the "does not meet expectations" related to the corrective actions he received, but they also noted that Plaintiff had been adapting well to his new role. *Id.*

Plaintiff completed his substance abuse counseling by July 30, 2014. Pl. Dep. 196:12–21. On July 30, 2014, Kissam, Hudson, and Sheppard met with Plaintiff to discuss an alleged "downturn in Plaintiff's performance." [ECF No. 33-19 at 1–3]. It is undisputed that the topics of discussion included Plaintiff's use of paid time off ("PTO"), his perception that management was picking on him, and management's concern that Plaintiff was openly discussing prescription medication. *Id.* Although it is undisputed that Thompson had shared Plaintiff's healthcare information with Delk and Sheppard,

---

[6] Kissam's deposition may be found at ECF No. 33-16.

Defendant insisted that "management"[7] had been told only that Plaintiff would need time off to attend appointments with the Medical Review Officer to be in compliance with his CDL. *Id*. Plaintiff advised the meeting participants that some of his PTO was attributable to the company's requirement that he attend doctor appointments and that he had taken time off for vacation for his health, but management responded that Plaintiff needed to "manage his PTO appropriately and make good decisions when taking time off." *Id*. When Plaintiff commented that he felt like he was being watched all the time and forced to stay in a work cube in the open, Hudson responded that it was "best . . . so that supervision [could] keep an eye on him." *Id*. Additionally, Plaintiff was advised to continue to meet with the Medical Review Officer/Counselor as required, as "he created this issue, not [management], and at no time was [sic] his HIPAA rights violated." *Id*.

Evans and Hudson then met with Plaintiff to discuss an "Hourly Employee Performance Discussion Form" in which Evans noted Plaintiff has not appropriately managed his PTO by consistently requesting PTO with short or no notice. [ECF No. 33-19 at 4]. The document indicates Plaintiff had 4 hours of PTO remaining as of the end of July and that time off without pay is not acceptable and would be a performance issue. *Id*. However, all of Plaintiff's PTO had been approved by Evans, who testified that employees are not disciplined for using approved PTO. Evans Dep. 25:10–26:15, 64:4–11. Additionally, there was no policy prohibiting employees from using PTO by a

---

[7] It appears that management referred to Kissam and Hudson as management, as it is undisputed that Sheppard had Plaintiff's healthcare information.

7

particular date or early in the year, and Plaintiff had not run out of PTO between 2012 and 2014. Evans Dep. 57:1–58:2; Hudson Dep. 69:12–10.

On August 4, 2014, Plaintiff gave to Evans a document indicating that he had filed a charge with the EEOC, because he believed that he was being subjected to unlawful unequal treatment. [ECF No. 33-2 at 4, 47]. Plaintiff advised management that he expected to be accommodated by leave for doctor visits, particularly because management required the doctor visits. *Id.* Sheppard testified that she retrieved Plaintiff's PTO report and had a conversation with Hudson and Evans about the allegations, but she never spoke to Plaintiff because she did not believe he was being treated unfairly. Sheppard Dep. 104:18–106:25

On December 12, 2014, Plaintiff was terminated for violating a fairly new policy prohibiting vehicles from being unlocked with guns present. Sheppard Dep. 56:7–21. Evans testified that, from the time Plaintiff was transferred to the warehouse until the time of his termination, Plaintiff engaged in no conduct that Evans considered a terminable offense, which aligns with the absence of disciplinary notes in Evans' records. Evans Dep., 54:6–17, 67:9–70:4. According to Evans, had Plaintiff not been reported for the gun in his vehicle, he should still be employed by Defendant. *Id*. Likewise, Sheppard testified that, had the situation with the guns not occurred, she would have expected that Plaintiff would still be employed by the company. Sheppard Dep. 79:2–9.

II.     Discussion

   A.     Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

9

B.     Analysis

1.     Timeliness

Defendant argues that Plaintiff is precluded from arguments related to his corrective actions because he did not timely file a charge by June 19, 2014, and August 27, 2014, respectively. Plaintiff's charge was filed on March 2, 2015. [ECF No. 31-4 at 32]. However, Plaintiff filed a verified complaint with the EEOC on June 10, 2014, and continued to communicate with the EEOC-assigned investigator in June, November, and December 2014. [ECF No. 31-4 at 16–19; 33-1 at 4–14]. Thus, Plaintiff argues that the court should apply equitable tolling in this instance, as the EEOC caused delays in processing his claim. [ECF No. 33 at 12–13]. The undersigned agrees.

The Fourth Circuit allows equitable tolling when there are "(1) extraordinary circumstances, (2) beyond [Plaintiff's] control or external to his own conduct, (3) that prevented him from filing on time." *Rouse v. Lee*, 339 F.3d 238, 246 (4th Cir. 2003) (rehearing en banc), *cert. denied*, 541 U.S. 905 (2004). In the employment-discrimination context, the Fourth Circuit has applied equitable tolling when the untimely filing resulted from processing delays at the EEOC. *Morris v. Lowe's Home Centers, Inc.*, 2011 WL 2417046, No. 1:10-CV-388 at *4 (M.D.N.C. June 13, 2011) (citing *Bishop v. Hazel & Thomas, PC*, 1998 WL 377912, No. 97-2284 (4th Cir. July 1, 1998) and *Waiters v. Robert Bosch Corp.*, 683 F.2d 89, 92 (4th Cir. 1982)). Here, Defendant has not disputed that the delay in the filing of the charge relates to the EEOC's processing delay. Therefore, the undersigned recommends the statute of limitations related to Plaintiff's corrective actions be equitably tolled.

2.      Disparate Discipline

To establish a prima facie case of disparate discipline under the ADA, Plaintiff must show: (1) that he is disabled; (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against [him] were more severe than those enforced against other similarly-situated employees. *Iskander v. Dep't of Navy*, 116 F. Supp. 3d 669, 679 (E.D.N.C. 2015), *aff'd*, 625 F. App'x 211 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 1721, 194 L. Ed. 2d 818 (2016) (citing *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993)).[8]

a.      Disability

Defendant argues that Plaintiff has failed to show that he was disabled. Under the ADA, a "disability" includes: (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being "regarded as" having such an impairment. 42 U.S.C. § 12102(1). Plaintiff's strongest argument is that Defendant regarded him as disabled, and the undersigned addresses it below.

---

[8] Plaintiff first argues that he can show direct evidence of discrimination and avoid the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), because Defendant placed restrictions on him on the same day that he was disciplined for his truck being in unsuitable conditions. The undersigned disagrees that the temporal proximity constitutes evidence of direct discrimination. "The Fourth Circuit defines 'direct evidence' as evidence that the employer 'announced, admitted, or otherwise indicated that [the forbidden consideration] was a determining factor . . . .'" *Jeffers v. Lafarge N. Am., Inc.*, 622 F. Supp. 2d 303, 315 n.7 (D.S.C. 2008) (quoting *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 485 (4th Cir. 1982)) (brackets and ellipsis in original).

11

Under the ADA, an individual is regarded as disabled if his employer takes an employment action based on an impairment or one the employer believes the employee has. 42 U.S.C. § 12102(3). Here, Defendant required Plaintiff to undergo a fitness-for-duty report and further required Plaintiff to: (1) refrain from using any controlled substances unless prescribed and then only as specifically instructed; (2) cooperate with his substance abuse professionals, including attendance at all scheduled meetings; and (3) attend follow-up visits with Dr. Floyd at three-month, six-month, and one-year intervals. *Id*. The undersigned finds these requirements sufficient to show that Defendant regarded Plaintiff as having a disability.

Although Defendant claims that the decision makers did not have knowledge of Plaintiff's opioid dependence, the undersigned must view all facts in the light most favorable to Plaintiff. Plaintiff has presented evidence that (1) Sheppard was aware of all of Plaintiff's medical information; (2) Kissam and Hudson admit that they knew Plaintiff was undergoing a fitness-for-duty exam related to his CDL license, despite the fact that his job duties did not require a CDL license; (3) Kissam was aware that Plaintiff met with Sheppard and Delk on August 23, 2013, immediately prior to the meeting concerning his Corrective Cction; and (4) Kissam told Plaintiff that Plaintiff "had created this issue." The undersigned finds this evidence sufficient to reflect a genuine dispute of material fact as to the decision maker's awareness of Plaintiff's opioid dependence.

      b.      August 2013 Corrective Action

Defendant argues that Plaintiff cannot show a comparator for the Corrective Action related to his truck, as Plaintiff has admitted that the condition of his truck was

12

one of the worst. [ECF No. 31-1 at 20]. However, in this instance, the most obvious comparison is Defendant's treatment of Plaintiff before allegedly learning of his opioid dependence and after. Plaintiff's severely dirty truck did not change, but he was treated differently in August 2013, after management regarded him as disabled.

Therefore, the burden shifts to Defendant to produce a legitimate non-discriminatory reason for disciplining him for the condition of his truck after learning of his opioid dependence. Defendant cites to a newly-discovered awareness of deplorable condition in which it found Plaintiff's truck. *Id*. Therefore, the burden shifts back to Plaintiff to show that Defendant's reason was pretext for discrimination. In addition to the temporal proximity, Plaintiff asserts that Hudson had been aware of the condition of his truck, which had not substantially changed. ECF No. 33-2 at 2]. Further, Hudson testified that safety inspectors would randomly inspect company vehicles for safety, and if there is a problem, the employee is first consulted and advised to resolve the problem. Hudson Dep. 20:2–11. The undersigned finds Plaintiff has rebutted Defendant's reason concerning the Corrective Action.

c.     Admonitions Related to PTO

In July 2014, Plaintiff received admonitions from management for his method and timing of using his PTO in the first half of the year. [ECF No. 33-19 at 1–4]. During the meetings discussing this issue, Plaintiff asserted that he had been forced to use much of his PTO to attend appointments that Defendant required him to attend. [ECF No. 33-19 at 1–3]. In response, management told Plaintiff that he "created this issue, not us" and noted that he needed to continue to meet with the Medical Review Officer as required. *Id*. at 3.

13

Plaintiff has provided direct evidence that Defendant blamed Plaintiff for his perceived disability and has identified a dispute of fact as to whether Defendant discriminated against him based on the perceived disability.

### d. Termination

Plaintiff was terminated for having had loaded, visible firearms in his unlocked vehicle in violation of Defendant's policy. Plaintiff has made a prima facie case by showing that another employee, Everett Smith, received only a verbal warning when he violated the same policy by having visible firearms in his locked vehicle. Defendant has provided a legitimate reason for more harshly disciplining Plaintiff because of his prior discipline, the fact that his guns were loaded, and because his car was unlocked. Therefore, the burden shifts back to Plaintiff to show pretext.

For signs of pretext,Plaintiff cites to the pattern of animus Defendant showed toward him because of his perceived disability. The undersigned notes there is a question of fact as to whether the prior discipline Defendant relies on to distinguish Plaintiff from Smith was itself discriminatory. The undersigned finds Plaintiff has demonstrated a dispute of fact as to whether Defendant's reason for disciplining him more harshly was pretext for illegal discrimination.

Because a fact finder is needed to make credibility determinations related to Plaintiff's disparate discipline claims, the undersigned recommends Defendant be denied summary judgment on these claims on Plaintiff's claims for disparate discipline.

### 3. Hostile Work Environment

To establish a hostile work environment claim pursuant to the ADA, Plaintiff must present evidence that: (1) he is a qualified person with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the conduct was sufficiently severe or pervasive to alter his condition of employment and to create an abusive work environment; and (5) the conduct is imputable on some factual basis to his employer. *Mason v. Wyeth*, 183 F. App'x 353, 360–61 (4th Cir. 2006) (citing *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176–77 (4th Cir. 2001)).

Plaintiff has not shown that the alleged unwelcome conduct was attributable to his disability.[9] In support of his hostile work environment claim, Plaintiff points to the following unwelcome conduct in support of his hostile work environment claim: (1) he was denied permission to drive a company vehicle; (2) he was transferred to the warehouse; (3) he was not allowed to move desks; (4) he was forced to work under people junior to him; and (5) he was disciplined for personal computer use when other employees were not. [ECF No. 33 at 21–22]. To show that Defendant's actions were attributable to his disability, Plaintiff points to the following evidence: (1) suspicious timing of a poor midyear evaluation and discipline for a messy truck; (2) statements that he "created this issue"; and (3) disparate discipline for a messy truck and keeping firearms in plain view in his car. [ECF No. 33 at 23–24].

---

[9] In light of the undersigned's finding that Plaintiff has not met an element of the prima facie case, the undersigned does not address the remaining elements.

15

Although Plaintiff cites to case law noting that a mosaic of circumstantial evidence may include suspicious timing, ambiguous statements, and evidence of pretext, a review of the case law cited reveals that these cases only discuss whether this type of evidence may support a showing of causation for an adverse employment action. *See, e.g., Childs-Bey v. Mayor and City of Baltimore*, 2013 WL 5718747 (D. Md. October 17, 2013) (explaining why Plaintiff's evidence was insufficient to create a convincing mosaic of but-for causation in a retaliation claim). Although Plaintiff may use the same evidence to show a hostile work environment as he uses to support his additional claims, Plaintiff's claim that he suffered disparate discipline based on his disability does not convert every unfavorable decision Defendant makes to harassment attributable to his disability. Because Plaintiff has failed to show harassment attributable to his disability, the undersigned recommends Defendant be granted summary judgment on his hostile work environment claim.

### 4.    Failure to Accommodate

To establish a prima facie failure-to-accommodate claim, a plaintiff must allege facts showing: "(1) that [he] was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of [his] disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; (4) that the [employer] refused to make such accommodations." *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387, n. 11 (4th Cir. 2001) (citing *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2nd Cir. 1999)).

Plaintiff has failed to make a prima facie case of failure to accommodate because he has not shown that he needed an accommodation to perform his job. Plaintiff requested that he be given additional PTO, as he had been forced to use much of his PTO in attending appointments required by Defendant, and Defendant refused this accommodation. However, Plaintiff never exhausted his PTO, and therefore cannot show that he needed this accommodation to perform the essential functions of his position. Therefore, the undersigned recommends Defendant be granted summary judgment on his failure-to-accommodate claim.

5. Retaliation under the ADA

The ADA prohibits retaliation by an employer against an employee who opposes any practice made unlawful by the ADA. 42 U.S.C.A. § 12203(a). To prevail on a retaliation claim, the employee must first establish a prima facie case of retaliation by showing that (1) he engaged in protected activity; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action. *Id.*; *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001). "Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." *Dowe v. Total Action AgainstPoverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998).

If the plaintiff satisfies this burden, then his employer must articulate a legitimate non-retaliatory reason for its action. *Id*. Once the employer meets this burden of

17

production, the plaintiff must show that the employer's articulated reason is pretext for forbidden retaliation. *Id*.

Plaintiff alleges he engaged in protected activity by filing an EEOC complaint and advising Defendant that he believed he was subject to disparate discipline on August 8, 2014. [ECF No. 33 at 29]. It is undisputed that Defendant took an adverse action against him by discharging him four months later. The Fourth Circuit has held that a temporal proximity of four months is insufficient alone to show a causal connection. *See, e.g.*, *Pascual v. Lowe's Home Ctrs., Inc.*, No. 05-1847, 2006 WL 2226571 (4th Cir. Aug. 2, 2006) (holding that three to four months between the termination and protected activities is too long to establish a causal connection by temporal proximity alone). However, in addition to the temporal proximity, Plaintiff has shown that Defendant forced him to attend doctor's appointments that required him to use PTO, and then admonished him for his approved use of PTO. Viewing the facts in the light most favorable to Plaintiff, the undersigned finds that Plaintiff has provided sufficient evidence to make a prima facie case of retaliation.

The burden then shifts to Defendant to set forth a legitimate non-retaliatory reason for Plaintiff's termination. Defendant states it terminated Plaintiff after discovering that he had visible firearms in his unlocked car in violation of Defendant's policy prohibiting guns in unlocked cars. [ECF No. 33-24 at 2–3, 15]. Therefore, the burden shifts back to Plaintiff to show pretext.

Plaintiff has set forth evidence that another employee, Everett Smith, was found to have unconcealed firearms in his car, but the car was locked. Sheppard Dep. 65:15–

18

66:16. Smith received a verbal warning, which is not documented in the employee's personnel file. *Id*. at 66:17–67:4. Defendant has noted that Smith's car was locked and his firearm was not loaded. Even taking into account these differences, under the circumstances of this case, the disparity in the discipline received by Plaintiff and Smith for violations of the same policy reflects a genuine dispute of material fact as to whether Defendant's articulated reason for terminating Plaintiff was pretext for retaliation. Therefore, the undersigned recommends Defendant be denied summary judgment on Plaintiff's retaliation claim.

III.  Conclusion

For the reasons discussed above, the undersigned recommends Defendant's motion for summary judgment be granted as to Plaintiff's claims of hostile work environment and failure to accommodate, and be denied as to Plaintiff's claims of disparate treatment and retaliation.

IT IS SO RECOMMENDED.

*[signature: Shiva V. Hodges]*

January 12, 2018                             Shiva V. Hodges
Columbia, South Carolina                     United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

19

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).